UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| V. | ) | No. 2:09-CR-52 |
| | ) | |
| ANTONIO B. GAINES | ) | |
| SOMMER L. WRIGHT | ) | |

**REPORT AND RECOMMENDATION**

Both defendants have been indicted for (1) conspiring to distribute cocaine, (2) possessing cocaine with the intent to distribute it, and (3) possessing 100 or more grams of heroine with the intent to distribute it. Additionally, the defendant Gaines is charged with possession marijuana with the intent to distribute.

Some or all of the evidence which likely will be introduced against the defendants was obtained on March 28, 2009, during a warrantless search of a room at the Days Inn Motel in Bristol, Tennessee, which was occupied by the defendants. As a result of evidence discovered during the search, the defendants were arrested. The defendant Gaines has filed a motion to suppress that evidence. (Doc. 26).

This motion has been referred to the United States Magistrate Judge for a report and recommendation under the standing orders of this Court and pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on September 9, 2009.

Gaines' motion to suppress his statement relies on the lack of a *Miranda* warning before he made his incriminating statement. Similarly, Wright's motion to suppress her statement is based upon coercion and lack of voluntariness. The specific bases of those two

motions to suppress statements notwithstanding, both are directly affected by Gaines' motion *to suppress the evidence* seized during the warrantless search of the motel room; if the search of the motel room was improper, there would have been no basis to arrest either defendant and thus, no incriminating statements would have been made by either defendant, with or without a preceding *Miranda* warning. In other words, if Gaines' motion to suppress evidence is granted, the two motions to suppress statements necessarily will be granted on the basis that those statements were "fruit of the poisonous tree," *Wong Sun v. U.S.*, 371 U.S. 471 (1963).

The lawful occupant of a motel room has the same expectation of privacy in that rented room as he would in his own residence. *United States v. Killebrew*, 560 F.2d 729, 733 (6th Cir. 1977). Thus, the officers in this case were obliged to either obtain a warrant before searching the defendants' motel room, or affirmatively demonstrate that their warrantless search of the room comes within an exception to the Fourth Amendment's requirement for a warrant. *See, e.g., Coolidge v. New Hampshire*, 403 U.S. 443 (1971). The affected person's consent, of course, is a well-recognized exception to the Fourth Amendment's requirement for a warrant. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). It is the United States' position in this case that Mr. Gaines consented, not just once, but three times to the search of the motel room. It is Mr. Gaines' position that he unequivocally denied permission to search three separate times. The burden is upon the United States, to prove by a preponderance of the evidence, that Mr. Gaines consented. *See, United States v. Mendenhall*, 446 U.S. 544 (1980).

Two police officers of the Bristol Tennessee Police Department testified that Mr. Gaines consented to the search of the room. Mr. Gaines testified that he expressly denied permission when the officers requested permission to enter the room and search it. Thus, the resolution of Mr. Gaines' motion to suppress evidence depends entirely upon a credibility determination of the two officers on the one hand, and Mr. Gaines on the other. Either the officers are telling the truth, or they lied. By the same token, either Mr. Gaines is telling the truth, or he lied. There is no way to reconcile their competing testimonies. For that reason, some facts must be discussed which at first blush would seem utterly unrelated to the motion to suppress.

At approximately 6:50 a.m. on March 27, 2009, the 911 operator in Bristol, Tennessee, received a cell phone call in which the operator could hear a violent altercation.[1] Approximately 10 minutes later, Shannon Jones called the 911 operator reporting that it was she who had placed the earlier call and that the man assaulting her, Cornelius Hardy, had knocked the phone from her hand and stomped it. She reported that Hardy was a black male, and was accompanied by a black female, "Mindy." Jones advised the operator that Hardy was driving a white SUV, but she was unable to get the license tag number.

Some time during the day, Jones obtained a warrant for Hardy's arrest (Exhibit 3).

Approximately 12:25 a.m. on March 28, Shannon Jones called the 911 operator for a third time, reporting that she had a friend who had done some "detective work" and who

---

[1]The "911 tape" of this, and other calls, was filed as Exhibit 2.

3

had discovered that Hardy was staying in Room 235 at the Days Inn in Bristol, with a black female companion, and that he was dealing drugs out of that room. She also reported that Hardy was driving a white Nissan SUV.

Albert Overbey, a patrol officer with the Bristol Police Department, received a call from his dispatcher (not the 911 operator) regarding a report of drug dealing in Room 235 of the Days Inn. Officer Brandon Carter, another patrol officer, also responded to that call. Officer Chesney Griffin, a canine officer, radioed that she, too, would report to the motel with her drug detecting dog.

It is at this juncture a discrepancy arises in the proof regarding the content of the dispatcher's transmission to the officers. Both Overbey and Carter were asked during their cross examinations about their knowledge of Cornelius Hardy, a/k/a "Flex." Both of them testified that they had some vague recollection of hearing the name "Flex" at some point in time, but they did not recall ever hearing the name Cornelius Hardy. More significantly, both testified that they did not recall any information that Cornelius Hardy, or "Flex," was the individual in Room 235 at the Days Inn on March 28.

In the recording of the dispatcher's transmissions to these officers, the dispatcher can be clearly heard to mention the name Cornelius Hardy. Moreover, the dispatcher said nothing about any drug dealing in Room 235.

However, it should be noted that the disc containing the recording (Exhibit 2) is not complete; it starts with Overbey's response to an earlier transmission by the dispatcher. It is undisputed that the two officers, when the arrived at Room 235, told the occupants that

4

they had a report of drug dealing in that room. Although there is no evidence in the record to support this conclusion, it is reasonable to infer from all the circumstances, including the testimony of the three officers, that they were first told by their dispatcher that a caller had reported drug dealing in Room 235 at the Days Inn, and it was the subsequent dispatcher transmission that referred to Cornelius Hardy. It is also a reasonable inference from all the proof that the officers merely failed to recall the dispatcher's reference to Mr. Hardy. In any event, there is no reason for either of these offices to have lied about receiving a communication from their dispatcher regarding Cornelius Hardy. Hardy adds nothing to, or detracts from, any of the other facts hereafter discussed. To illustrate the point, the officers could have gone to Room 235, and announced that they were (1) looking for Cornelius Hardy, and (2) they had a report of drug dealing in the room. Again, there was no reason for these officers to have lied about not recalling any reference to Cornelius Hardy, and the court believes them.[2]

After arriving at the Days Inn and speaking briefly with the clerk, the three officers approached Room 235. Overbey and Carter went to the door itself, while Griffin and her dog stayed some distance back for reasons of safety. One of the other officers knocked on the

---

[2]Also, Officer Carter testified during his direct examination that when they arrived at the Days Inn, he noted that there was no "white Nissan" in the parking lot. It was Shannon Jones in her third call to the 911 operator who reported that Cornelius Hardy was driving a white *Nissan* SUV. Thus, Carter obviously was on the lookout for this vehicle for some reason, and it presumably was because of the dispatcher's call. For whatever reason, these two officers placed little significance on the name Cornelius Hardy, and far more on the report of drug dealing out of Room 235.

door, while the other shielded himself behind the wall a few feet away.³ After knocking, Carter announced that they were Bristol Police Officers. A male voice within the room asked, "Who is it?" Carter responded, "The police." At that point, the male said, "Come in." It is at this point that the testimony of the officers and that of Mr. Gaines wildly and irresolveably diverge.

The officers testified that Carter tried the knob, but the door was locked. He again knocked, and the man inside said, "I'll be there in a minute." Finally, after a lapse of three to five minutes, Gaines opened the door. At that point, the officers told him that they had reports of drug dealing in the room, and they requested permission to search. Both Officers Overbey and Carter testified that Gaines consented, not once, but three times, after Carter repeated his request to insure that there was no misunderstanding.

Gaines, however, testified that he and the co-defendant Wright were in the room kissing when they heard a loud banging on the door. He asked, "Who is it?", and thereafter heard, "Sullivan County [sic] Police Department, open the door right now!"⁴ Gaines testified that he peeked through the curtains covering the picture window and saw the female officer with her dog, and that he then looked out the peep hole in the door and saw the two male officers with their guns drawn. Both Overbey and Carter, however, testified that neither of them ever drew their weapon, although Overbey testified that he likely had his hand on his

---

³Again, there is a discrepancy about who knocked on the door, whether it was Overbey or Carter. This, too, is an unimportant discrepancy.

⁴Mr. Gaines insisted that the officers announced that they were with the Sullivan County Police Department, which, of course, they are not; there is no such thing.

6

weapon.

Gaines testified that he again heard one of the officers demand that he should "Open the door!", and that Ms. Wright said, "Hold on, we're coming." Gaines testified that three minutes elapsed before he actually opened the door.

Gaines testified that it was clear that the officers were demanding that the door be opened, and that he felt that he had no choice but to do so.

And it is at this point that the critical consent *vel non* issue arises. As previously stated, Officers Overbey and Carter both testified that Gaines consented three separate times. Gaines testified that although he was asked three separate times to consent to a search of the room, he emphatically denied permission each time. According to Gaines, after he refused for the third time, he basically was pulled outside the room in his stocking feet; Wright was told to remove herself from the room; and Officer Griffin and her dog entered the room and commenced the search.

Who is telling the truth? It boils down to an issue of credibility and inferences drawn from the totality of the circumstances. The United States has proven, by a preponderance of the evidence, that the officers have testified truthfully, and their version is believed. Accordingly, the court finds that Mr. Gaines consented to a search of his motel room and there was no violation of the Fourth Amendment. Therefore, it is recommended that his motion to suppress evidence (Doc. 26) be denied.[5]

---

[5]Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

Respectfully submitted,

                                                               s/ Dennis H. Inman  
                                                  United States Magistrate Judge